**INTEST CORPORATION, and Intest IP Corp., Plaintiffs,**

v.

**REID–ASHMAN MANUFACTURING, INC., Defendant.**

**Civil Action No. 99–247–JJF.**

United States District Court,
D. Delaware.

Sept. 10, 1999.

Kevin W. Goldstein, Ratner & Prestia, Wilmington, DE, Kevin R. Casey, Daniel N. Calder, and Christopher J. Dervishian, Ratner & Prestia, Valley Forge, PA, for plaintiffs.

Donald F. Parsons, Jr., Thomas C. Grimm, Richard W. Ellis, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, David N. Koffsky, Ohlandt, Greely, Ruggerio & Perle, Stamford, CT, of counsel, for defendant.

## OPINION

FARNAN, Chief Judge.

This action was brought by the Plaintiffs, inTEST Corporation and inTEST IP Corp. against the Defendant, Reid–Ashman Manufacturing, Inc. for infringement of U.S.Patent No. B1 4,589,815. By agreement of the parties, cross-motions for summary judgment have been submitted on the issue of intervening rights. For the reasons set forth below, the Court concludes that the Defendant is not precluded from asserting the defense of intervening rights. Accordingly, the Plaintiffs' Motion For Summary Judgment (D.I.16) will be denied and the Defendant's Motion For Summary Judgment (D.I.19) will be granted.

## BACKGROUND

### I.  Procedural Background

On November 18, 1998, the Plaintiffs, inTEST Corporation and inTEST IP Corp., filed an action for infringement of U.S.Patent No. B1 4,589,815 against the Defendant, Reid–Ashman, Manufacturing, Inc. and its president, Steven J. Reid, in the United States District Court for the District of Columbia. By agreement of the parties, the action in the District of Columbia was dismissed against both of the Defendants.

On April 16, 1999, the Plaintiffs filed this action for patent infringement against the Defendant, Reid–Ashman, Manufacturing, Inc. On May 6, 1999, the Defendant filed its Answer, denying infringement and asserting a number of defenses including the defense of intervening rights. In the interest of fostering a settlement, or in the alternative, narrowing the issues for discovery and trial, the parties have agreed to seek an early resolution of the intervening rights issue by filing cross-motions for summary judgment. The parties have ful-

ly briefed the pending motions, and the Court held oral argument on the motions on July 28, 1999.

## II.  Factual Background

### A.  *The Parties*

The Plaintiffs and the Defendant are competitors in the business of designing, manufacturing and marketing docking hardware and test head manipulators. The devices manufactured by the Plaintiffs and the Defendant are used to position and dock an electronic test head of a semiconductor testing system with respect to an electronic device handler.  This equipment is commonly known in the industry as mechanical interfacing equipment.

Mechanical interfacing equipment is used to test electronic devices.  Specifically, the equipment includes an electronic test head which contains test circuitry, and a device handler which is used to position the device to be tested with respect to the test head.  The term "interfacing" refers to the engagement of the fragile electrical contacts of the test head with the electrical contacts on the device handler.  If not properly aligned before engagement, the contacts of both the test head and the device handler can be damaged.  The patent in issue in this action relates to a device which is aimed at preventing damage to the electrical contacts by assuring precise alignment before engagement.

### B.  *The '815 Patent*

U.S.Patent No. B1 4,589,815 issued to inventor Nathan R. Smith on May 20, 1986 (the "original '815 Patent") and is directed to a system for positioning and docking an electronic test head of a test system with respect to an electronic device handler. (D.I.18, Ex. 2).  Stated another way, the device claimed in the patent is used to align and engage the electrical contacts of a semiconductor test system.

Upon the request of both the Plaintiffs and the Defendant, the United States Patent and Trademark Office (the "PTO") subjected the original '815 Patent to reexamination proceedings.[1]  In granting the parties' requests for reexamination, the PTO held that the references cited by the parties in their requests for reexamination raised a substantial new question of patentability of Claims 1–9.  In addition, the PTO indicated that a Patent Examiner would likely consider U.S.Patent No. 4,230,985 issued to Matrone et al. (the "Matrone Patent") and U.S.Patent No. 4,284,311 issued to Hilman Forster et al. (the "Forster Patent") in determining whether Claims 3–9 are patentable and both the Matrone Patent and the Forster Patent, individually and in combination with U.S.Patent No. 4,389,155 issued to Charles A. Absher, in determining whether Claims 1 and 2 are patentable. (D.I. 18, Ex. 9 at 4–8; Ex. 10 at 2–6).

In an Office Action and Reexamination issued April 1, 1997, the Patent Examiner confirmed the patentability of Claims 1, 2 and 7–9 of the original '815 Patent.  However, the Examiner rejected Claims 3 through 6 in light of the Matrone Patent. Specifically, the Patent Examiner rejected Claims 3, 4 and 6 pursuant to 35 U.S.C. 102(b) as being anticipated by the Matrone Patent.  The Examiner also rejected Claim 5 pursuant to 35 U.S.C. 102(b) as being anticipated by the Matrone Patent, or in the alternative, pursuant to 35 U.S.C. 103(a) as being unpatentable over the Matrone Patent.  (D.I. 18, Ex. 12 at 1, 3–5).

In response to the Office Action, an interview was held with the Patent Examiner on April 29, 1997.  Claim 3 of the original '815 Patent was the focus of this interview.  In the original '815 Patent Claim 3 read as follows:

> 3.  A system for docking and undocking an electronic test head with respect to

---

1.  The Plaintiffs filed their Reexamination Request on January 23, 1996, and the Defendant filed its Reexamination Request on July 19, 1996.  The PTO subsequently consolidated both requests.  (D.I.18, Ex. 11).

an electronic device handler with the test head and the device handler having respective first and second electrical contact means adapted to mate with each other comprising:

at least first and second alignment pins rigidly secured to the test head on either side of the first contact means,

at least first and second alignment bars having respective first and second guide openings and rigidly secured with respect to the device handler on either side of the second contact means, the first and second guide openings precisely aligned with respect to and for receiving respective first and second alignment pins for accurate mating of the first and second contact means, and

first and second platform means each having an upper surface secured with respect to the test head on either side of the first contact means and selectively spaced with respect to the first and second alignment pins, the first and second platform means upper surfaces and the first and second alignment pins having a height so that upon engagement with the respective first and second alignment bars of thickness there is prevented engagement of said first and second contact means until the first and second alignment pins are received in the respective first and second guide openings for achieving precise alignment thereby to avoid damage to the first and second contact means.

(the "original Claim 3") (D.I.18, Ex. 2).

During the interview, the patent owner proposed an amendment to original Claim 3. The proposed amendment was directed to the penultimate paragraph of Claim 3 and specified that the first and second alignment bars have a "thickness" and "a space" between the alignment bars. (D.I. 18, Ex. 13 at 2–3). Agreeing with the patent owner that the proposed amendment defined over the Matrone Patent, the Patent Examiner noted that the Matrone Patent teaches a "flush surface with contacts and a hole to receive the pin ...

rather than at least a pair of raised bars with thickness which defines a space therebetween." (D.I. 18, Ex. 13 at 1). Allowing the proposed amendment, the Patent Examiner further stated in the Reasons For Patentability:

> While Matrone et al. [The Matrone Patent] show a system which is used for the same purpose as the present invention, the alignment pins 58 of Matrone et al. are apparently inserted into a surface which is flush with the contacts 32. Thus, Matrone et al. show no alignment bars which define guide openings and have a thickness which defines a space between the bars (i.e. the surfaces which are otherwise similar to the alignment bars are not raised above the level of the surface 26 in Matrone et al).

(D.I. 18, Ex. 15 at 2).

The reexamination certificate issued on April 7, 1998 (the reexamined "'815 Patent"). Amendments were added to the last and second to last paragraphs of Claim 3, such that Claim 3 of the reexamined '815 Patent reads:

> 3. A system for docking and undocking an electronic test head with respect to an electronic device handler with the test head and the device handler having respective first and second electrical contact means adapted to mate with each other comprising:
>
> at least first and second alignment pins rigidly secured to the test head on either side of the first contact means,
>
> at least first and second alignment bars *having thickness to define a space therebetween and* having respective first and second guide openings and rigidly secured with respect to the device handler on either side of the second contact means, the first and second guide openings precisely aligned with respect to and for receiving respective first and second alignment pins for accurate mating of the first and second contact means, and

first and second platform means each having an upper surface secured with respect to the test head on either side of the first contact means and selectively spaced with respect to the first and second alignment pins, the first and second platform means upper surfaces and the first and second alignment pins having a height so that upon engagement with the respective first and second alignment bars [of] *having* thickness there is prevented engagement of said first and second contact means until the first and second alignment pins are received in the respective first and second guide openings for achieving precise alignment thereby to avoid damage to the first and second contact means.

(emphasis indicates additions made to the claim in reexamination, and brackets indicate deletions) (the "reexamined Claim 3") (D.I.18, Ex. 2).

## DISCUSSION

### I. Standard of Review

#### A. *Federal Rule of Civil Procedure 56(c)*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Counsel for the parties have conferred and agree that there are no material facts in dispute. Accordingly, summary judgment is appropriate for the adjudication of the issues raised by the pending motions.

#### B. *Burden of Proof*

While the parties agree that summary judgment is appropriate, the parties disagree on the issue of which party bears the burden of proof. The Plaintiffs contend that the Defendant bears the burden of proof, because it is the Defendant who is raising the affirmative defense of intervening rights.

However, the Defendant does not frame the issue as whether it may assert the defense of intervening rights. Rather, the Defendant contends that the issue is whether the original and amended claims are identical, such that an exception to the grant of intervening rights applies. Relying on the language of 35 U.S.C. § 252, the Defendant contends that the intervening rights set forth in the second paragraph of Section 252 permit an alleged infringer to continue certain activities after the issuance of a reexamination certificate "unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent." 35 U.S.C. § 252. According to the Defendant, the issue of whether the original and amended claims are identical is part of the Plaintiffs' burden of proving infringement of a valid claim. Because this question goes to infringement, the Defendant contends that the Plaintiffs bear the burden of proof.

The doctrine of intervening rights as codified by 35 U.S.C. § 252 is set forth in two paragraphs. Under the first paragraph of Section 252, a court is expressly prohibited from considering intervening rights where the claims of the reissued patent are identical to the original patent. The second paragraph, however, provides for the protection of intervening rights. Interpreting Section 252, the Court of Appeals for the Federal Circuit stated, "[o]nce a determination is made that claims are not 'identical' within the meaning of the first paragraph of section 252, the defense of intervening rights under the second paragraph of section 252 can be raised." *Westvaco Corporation v. International Paper Company*, 991 F.2d 735, 742 (Fed.Cir.1993) (citing *Kaufman Company, Inc. v. Lantech, Inc.*, 807 F.2d 970, 978 (Fed.Cir.1986)).

In arguing that the Plaintiffs bear the burden of proof on the issue of whether the claims are identical, the Defendant appears to seize on the Federal Circuit's "two step" interpretation of Section 252. While the Court understands the Defendant's argument in light of the Federal Circuit's statement in *Westvaco* and the two paragraph structure of Section 252, the Court believes that the Defendant's approach to the burden of proof exalts form over substance.

■ The underlying rationale for intervening rights is that the public has the right to use what is not specifically claimed in the original patent. To accomplish this purpose, the doctrine of intervening rights allows "an infringer ... because of prereissue [or pre-reexamination] activity [to] enjoy a personal intervening right to continue what would otherwise be infringing activity after the reissue [or reexamination]" of a patent. Robert L. Harmon, *Patents and the Federal Circuit* § 15.3(b) at 599. In this regard, it is well established, that intervening rights is an affirmative defense, and as such, the burden of proof rests on the party raising the defense. *Id.* at 601. The Court cannot conclude that the Federal Circuit, by its statement in *Westvaco,* meant to alter this well-entrenched approach to intervening rights. Indeed, the Court can locate no case law by the Federal Circuit or by any other court to the contrary. Accordingly, for purposes of the instant motions, the Court

concludes that the Defendant bears the burden of proving that it is entitled to assert the defense of intervening rights.

## II. Intervening Rights

### A. *Applicable Law*

The defense of intervening rights is based on the second paragraph of 35 U.S.C. § 252.[2] Generally, the second paragraph of Section 252 provides that a reissued patent shall not abridge or affect the rights of those who acted before the reissue was granted when specific conditions are present. Pursuant to the mandate of 35 U.S.C. § 307(b), this defense also applies to reexamined patents. Accordingly, the defense of intervening rights allows an infringer, because of pre-reissue or pre-reexamination activity to enjoy a personal intervening right to continue what would otherwise be an infringing activity after the reissue or reexamination. *See Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 756 F.2d 1574, 1579 (Fed. Cir.1985).

■ The second paragraph of Section 252 provides for two types of intervening rights, absolute intervening rights and equitable intervening rights. *See BIC Leisure Prods., Inc. v. Windsurfing Int'l Inc.,* 1 F.3d 1214, 1220 (Fed.Cir.1993). The basis for absolute intervening rights is the first sentence of the second paragraph of Section 252. Absolute intervening rights extend only to specific things actually

2. The second paragraph of 35 U.S.C. § 252 provides:

A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such

matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

made, purchased or used before the grant of a reissued or reexamined patent. Thus, absolute intervening rights applies to things already in existence before the grant of the reissued or reexamined patent. *Id.* at 1220–1221.

■ The basis for equitable intervening rights is the second sentence of the second paragraph of Section 252. Unlike absolute intervening rights, equitable intervening rights concerns the manufacture, use, or sale of specific things after the issuance of a reissued or reexamined patent. Under equitable intervening rights, an infringer may continue to manufacture, use or sell additional products covered by the reissued or reexamined patent when the infringer made, purchased, or used identical products, or made substantial preparation to make, use or sell identical products, before the issuance of the reissued or reexamined patent. Thus, under equitable intervening rights, a court may protect investments made before the grant of the reissued or reexamined patent, if the equities dictate such a result. *Id.* at 1221.

■ Whether the protection of intervening rights afforded by the second paragraph of Section 252 applies to an infringer is dictated by the first paragraph of Section 252.[3] Under the first paragraph of Section 252, an infringer is not entitled to intervening rights when the reexamined and original patent claims are identical. When the reexamined and original patent claims are identical, the reexamined patent constitutes a continuation of the original patent and is deemed to have effect from the date of the original patent. *Kaufman,* 807 F.2d at 976. However, if the reexamined and original claims are not identical, then the patentee has no right to damages for infringement prior to the reissue or reexamination date, because the original patent has been surrendered and is extinguished. *Id.*

■■ For purposes of Section 252, the term "identical" means "without substantive change." *Kaufman,* 807 F.2d at 976. Amendments made to patent claims during reexamination do not substantively change the claims if they do not expand, narrow or otherwise alter the meaning or the scope of the claims in the original patent. *Id.* Amendments to a reexamined claim which clarify, restate, specify or make more definite that which was present, implied, or inherent in the counterpart original claim or the specification are not substantive changes, and therefore, claims amended in this manner are legally identical. *See e.g. Tennant Co. v. Hako Minuteman, Inc.,* 878 F.2d 1413, 1417 (Fed.Cir.1989) (holding that original claim providing for "a moveable first wall section" and a "second bottom wall section" was identical to amended claim adding word "bottom" to first wall section, because "a second cannot exist without a first, common sense dictates that the claimed first wall section is also a bottom wall section"). Subtle changes to a claim, however, may be substantive if they alter the scope of the claim. *See e.g. Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577 (Fed.Cir.1995) (holding that claim amended for a portable computer hard-disk drive system with a track density of "at least approximately 600 TPI" was not identical to original claim requiring track density of "at least 600 TPI" despite evidence that one skilled in the art understood specific track density values to represent ranges of values).

---

3. The first paragraph of Section 252 provides: The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are identical, such surrender shall not affect any action then pending nor abate any cause of action then existing and the reissued patent, to the extent that its claims are identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.

■ Thus, it is the scope of the claims, and not the language of the claims, that must be identical to preclude the defense of intervening rights. *See e.g. Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d 1247, 1250 (Fed.Cir.1997) (recognizing that key to intervening rights analysis is whether scope of claims is same after reexamination, not whether same words are used). Accordingly, in analyzing whether a claim change during reexamination is substantive such that the scope of the original and reexamined claims is no longer identical, a court must consider the particular facts, the prior art, the prosecution history, the references that occasioned the reexamination and any other relevant information. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed.Cir.1998).

### B. Whether the Original '815 and Reexamined '815 are Identical

For purposes of the intervening rights issue presented by the pending cross-motions for summary judgment, the parties agree that the Court is presented with one central question. This question is whether the amendments to Claim 3 made during the reexamination proceeding substantively changed the scope of Claim 3, such that Claim 3 of the reexamined '815 Patent is not legally identical to Claim 3 of the original '815 patent.

#### 1. The Parties' Contentions

During reexamination, Claim 3 was amended to include the language "having thickness to define a space therebetween." In arguing that the Defendant is not precluded from asserting the defense of intervening rights, the Defendant contends that this language substantively changed the scope of Claim 3, such that reexamined Claim 3 is not identical to original Claim 3. In particular, the Defendant contends that the amendment is substantive because (1) it was necessary to distinguish over the Matrone Patent, and (2) it narrowed the scope of Claim 3 to provide for a specific limitation requiring the alignment bars to be raised to define a three-dimensional space or volume between the bars.

In response, the Plaintiffs contend that the amendment to Claim 3 merely clarifies the inherent physical and functional characteristics of the elements disclosed in original Claim 3, and therefore original Claim 3 and reexamined Claim 3 are identical such that the Defendant is precluded from asserting intervening rights. In support of their position, the Plaintiffs contend that original Claim 3 expressly required the alignment bars to be "of thickness" and implicitly required a space in between the alignment bars.

#### 2. The Case Law

The Defendant argues that the Court should conclude that the amendments were substantive, because they were necessary to distinguish the prior art of the Matrone Patent. The Plaintiffs contend that claims may still be found to be identical, even though they were amended to overcome a rejection based upon prior art. Both the Plaintiffs and the Defendant rely on a multiplicity of cases for their respective positions, some of which are cited by both parties as supporting their respective positions.

■ The Federal Circuit has, in at least one case, described an amendment resulting in the allowance of a claim previously rejected over prior art as a "highly influential piece of prosecution history." *Laitram*, 163 F.3d at 1348. However, the Court does not equate "highly influential" with either dispositive as the Defendant suggests or with irrelevant as the Plaintiffs suggest. What is dispositive and relevant for purposes of determining whether the claims are identical is whether the amendment has changed the scope of the claims, not simply whether the amendment is necessary to overcome prior art. Accordingly, the Court will not address the volume of cases cited by the Plaintiffs and the Defendant, but will instead focus its attention on the relevant inquiry, i.e. the

scope and meaning of original Claim 3 as compared to reexamined Claim 3.

### 3. Conclusions of Law Concerning the Scope of the Claims

■■■ After considering the oral and written arguments of the parties, as well as the relevant prior art and prosecution history of the '815 patent, the Court concludes that the amendment to Claim 3 made during the reexamination proceeding substantively changed the scope of the '815 Patent. Specifically, the Court concludes that the amendment to Claim 3 narrowed the scope of Claim 3 to require that the alignment bars be raised to define a three dimensional space or volume in between the bars. Because the amendment narrowed Claim 3, the Court concludes that original Claim 3 and reexamined Claim 3 are not legally identical, and therefore, the Defendant is not precluded from asserting the defense of intervening rights.

#### a. The "Thickness" Requirement

In arguing that the amendment "having thickness to define a space therebetween" did not change the scope of Claim 3, the Plaintiffs contend that original Claim 3 expressly required the alignment bars to be "of thickness," and therefore, the amendment merely clarified a limitation that was already contained in original Claim 3. That the phrase "of thickness" was present in original Claim 3 is not dispositive with regard to the effect of the amended language on the scope of the patent. As the Court previously stated, it is the scope of the claims, and not the language of the claims that must be identical to preclude intervening rights under Section 252. *See Bloom*, 129 F.3d at 1250. While both original Claim 3 and reexamined Claim 3 require "thickness," reexamined Claim 3 requires more than mere "thickness." Reexamined Claim 3 requires the thickness "to define a space therebetween," while original Claim 3 did not require any space in between the alignment bars. Under the language used

in original Claim 3, the Court concludes that the alignment bars could still have thickness, yet remain flush with the device plate. Stated another way, the Court concludes that original Claim 3 was broad enough to include both the device depicted as Alternative A in the Plaintiffs' diagram used at oral argument and the device described by the Matrone patent.

The Plaintiffs contend that a device with flush alignment bars like the device described by Matrone and the device depicted by alternative A would not be covered by original Claim 3, because original Claim 3 requires the alignment bars to have a thickness sufficient to protect the contact means. (Tr. 18). The Court disagrees with the Plaintiffs reading of original Claim 3. Original Claim 3 did not require the alignment bars to have a thickness sufficient to protect the contact means. Rather, original Claim 3 focused on the height of the platform means and the alignment pins as the features necessary to protect the contact means. In pertinent part, original Claim 3 read:

> the first and second platform means upper surfaces and the first and second alignment pins *having a height so that* upon engagement with the respective first and second alignment bars of thickness there is prevented engagement of said first and second contact means until the first and second alignment pins are received in the respective first and second guide openings for achieving precise alignment thereby to avoid damage to the first and second contact means.

(emphasis added). As the italicized language in original Claim 3 suggests, it is the height of the platform means and alignment pins which is critical to protecting the contact means.

The Court's reading of original claim 3 is supported by the reexamination history of the '815 Patent, including the position taken by the Plaintiffs during reexamination. During the reexamination proceedings, the Patent Examiner rejected original Claim 3 as being anticipated by the Matrone Pat-

ent. The Matrone Patent discloses a mechanical interfacing device that uses alignment pins, guide openings and platform means to effectuate a precise alignment between the device handler and the test head in order to prevent damage to the electrical contacts. In Matrone, the guide pins are only received into their respective guide openings when the alignment is correct. If the alignment is incorrect, the height of the pins and the platform means provide a "stand off" distance which protects the electrical contacts which are situated in the area between the guide openings.

The Patent Examiner concluded that Matrone raised a substantial question of patentability, because Matrone disclosed pins, a platform means and guide openings on either side of the electrical contacts that functioned in the same way as the claimed device. Specifically, the pins and platform means in both the Matrone Patent and original Claim 3 had a height sufficient to provide a "stand-off" distance to prevent engagement of the contacts until the alignment between the test head and the device handler is correct. Stated another way, the Examiner concluded that in original Claim 3 and the Matrone Patent, the contact means were protected only by the pins and the platform means and not by the thickness of the bars.

Although the Plaintiffs now contend that original Claim 3 requires the alignment bars to have a thickness sufficient to protect the contact means, the Plaintiffs did not take this position during the reexamination proceedings. In their request for reexamination, the Plaintiffs attempted to distinguish the Matrone Patent on the basis that Claim 3 of the '815 patent required alignment bars on either side of the con-

4. The Court also notes that, while the Plaintiffs now characterize the amendment as a clarifying change, Plaintiffs made no such statement during the reexamination proceedings. Rather, Plaintiffs stated that the amendment "includes a feature which is neither disclosed nor suggested by Matrone."

tacts. As the Plaintiffs explained in their request for reexamination:

> It is *because* the '815 patent includes alignment pins, alignment bars on either side of the second contact means, and platform means that misalignment of test head 11 and device handler 15 (and hence destruction of the first and second contacts) is prevented.

(D.I. 18, Ex. 8 at 5, underlining in original).

Notably, in their request for reexamination, the Plaintiffs did not distinguish the original '815 Patent from the Matrone patent on the ground that the thickness of the alignment bars protected the electrical contacts.[4] Indeed, it was not until the amendment was proposed, that the Plaintiffs argued that the thickness of the alignment bars protected the contact means. Admitting that the amendment requiring the alignment bars to have a thickness to define a space therebetween "define[s] over Matrone," the Plaintiffs explained:

> The holes in Matrone which engage respective pins are formed substantially flush with the surface of the contacts. It is *because* claim 3 includes alignment bars *having such thickness* that engagement of the contacts is prevented until the alignment pins are received in their respective guide openings. This way precise alignment is achieved and damage to the contacts is prevented. Thus, claim 3 is patentable over Matrone.

(D.I. 18, Ex. 14 at 3, underlining in original, italicized emphasis added). Thus, the Plaintiffs' statements support the Court's conclusion that the amended language of reexamined Claim 3 requires the thickness of the alignment bars to protect the contact means, while original Claim 3 required no such limitation.

(D.I. 18, Ex. 14 at 3). Plaintiffs' statement is consistent with the Court's conclusion that the amendment changed the scope of the '815 Patent to add a new limitation, rather than to merely clarify what was already present in the '815 Patent.

■ Accordingly, based on the reexamination history, including the prior art, the Patent Examiner's conclusions and the Plaintiffs' statements during reexamination, the Court concludes that the amended language to Claim 3 requires the alignment bars to have a thickness sufficient to protect the contact means. Based on the Court's understanding of the device, the thickness of the alignment bars is only significant in protecting the contact means if the alignment bars are raised above the device plate. Thus, the Court concludes that the amendment "having thickness to define a space therebetween" specifically requires the alignment bars to be of a raised thickness with respect to the device plate. Because this limitation was not present in original Claim 3 such that under original Claim 3 the alignment bars could have thickness yet remain flush with the device plate [5], the Court concludes that the amended language narrowed the scope of reexamined Claim 3 as compared to original Claim 3.

### b. The "Space" Requirement

In addition to their argument that original Claim 3 provided for alignment bars with a thickness, the Plaintiffs contend that "space" between the alignment bars is an inherent feature of original Claim 3. According to the Plaintiffs, the fact that the alignment bars are positioned on either side of the device plate necessarily means that there is space in between. According to the Plaintiffs, the space referred to in the amended language of Claim 3 need not be a three dimensional empty space or volume, but rather, the space in between could be filled by the device plate itself. (Tr. 44). The Court disagrees with the Plaintiffs reading of the amended language.

The amended language does not simply require the bars to be of thickness as was the case in original Claim 3. The amended language requires the bars to have a thickness which causes a specific result, namely "to define a space therebetween." Under the Plaintiffs' interpretation of the amended language, it is not the thickness of the bars which provides the space therebetween, but their position apart from one another that accounts for the space. Only if the alignment bars are raised above the device plate can the thickness achieve or define the space therebetween which is required by the amended language.

Further, in order for the thickness of the alignment bars to be significant in protecting the contact means, a feature of the amended patent which the Plaintiffs emphasized to the Patent Examiner during the reexamination, the Court concludes that the alignment bars must be raised to define a three dimensional space or volume in between the bars. If the alignment bars are not raised, then it is the height of the pins and platform means which serve to protect the contact means, as is the case in the original Claim 3. Indeed, the Patent Examiner recognized that the amended language requires raised bars in his comments allowing amended Claim 3:

> While Matrone et al. show a system which is used for the same purpose as the present invention, the alignment pins 58 of Matrone et al. are apparently inserted into a surface (i.e. surface 26) which is flush with the contacts 32. Thus, Matrone et al. show no alignment bars which define guide openings and have a thickness which defines a space between the bars (i.e. the surfaces which are otherwise similar are not raised

---

**5.** In arguing that the raised thickness of the alignment bars is required by original Claim 3, the Plaintiffs refer to Figure 5B of the specification which illustrates blocks 202a, b (the alignment bars) as raised. It is well-established that a limitation from the specification may not be imported into the claims, and therefore, the Court is not persuaded by

the Plaintiffs' argument concerning Figure 5B. *See Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1347–1348 (Fed.Cir.1998) ("interpreting what is *meant* by a word in a claim is not be confused with adding an extraneous limitation appearing in the specification") (emphasis in original, citations omitted).

above the level of the surface 26 in Matrone et al).

(D.I.18, Ex. 15).

Accordingly, the Court concludes that the term "space" as used in the amendment refers to empty three dimensional volume, which can only be achieved from the thickness of the alignment bars if the alignment bars are raised above the device plate. Because the Court concludes that the "space" required by the amended language was not inherent in original Claim 3, the Court concludes that the amendment narrowed the scope of reexamined Claim 3 as compared to original Claim 3.

### 4. Summary

In sum, the Court concludes that original Claim 3 and reexamined Claim 3 are not legally identical within the meaning of the first paragraph of 35 U.S.C. § 252, because the amendment made to Claim 3 during reexamination narrowed its scope. Because the claims are not identical, the Court further concludes that the Defendant is not precluded from raising the defense of intervening rights as set forth in the second paragraph of Section 252.

### CONCLUSION

For the reasons discussed, the Court concludes that the Defendant is not precluded from asserting the defense of intervening rights. Accordingly, the Plaintiffs' Motion For Summary Judgment will be denied and the Defendant's Motion For Summary Judgment will be granted.

An appropriate Order will be entered.